# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

BRANDON J. ASHDOWN,

        Plaintiff,

                                   **Civil Action 2:17-cv-00495**
                                   **Judge James L. Graham**
      v.                         **Chief Magistrate Judge Elizabeth P. Deavers**

TIM BUCHANAN, *et al.*,

        Defendants.

## REPORT AND RECOMMENDATION

This matter is before the Court upon review of Interested Party – State of Ohio's Motion to Dismiss (ECF No. 48) which was converted to a Motion for Summary Judgment by the Honorable James L. Graham, the presiding District Judge. (ECF No. 71, "Motion for Summary Judgment.") In his Order, Judge Graham permitted Plaintiff, Brandon J. Ashdown, a state inmate proceeding without the assistance of counsel, to submit evidentiary materials outside the pleadings in opposition to the State of Ohio's Motion. (Motion for Summary Judgment.) Plaintiff submitted evidentiary materials on July 5, 2019. (ECF No. 73.) State of Ohio filed a Reply.[1] (ECF No. 77.) For the following reasons it is **RECOMMENDED** that State of Ohio's Motion for Summary Judgment be **DENIED**. (ECF No. 48.)

---

[1] The Court notes that attorney George Horváth did not include his Ohio Supreme Court Registration number immediately after his name or within his address block on the State of Ohio's Reply in Opposition to Plaintiff's Materials or on any document he has filed in this case. (ECF No. 77.) Attorney Horváth is reminded that in the future he must follow Southern District of Ohio Local Civil Rule 83.5. S.D. Ohio Loc. Civ. R. 83.5 ("Ohio Supreme Court

# I.    PROCEDURAL BACKGROUND

Plaintiff initiated this action on June 8, 2017, alleging deliberate medical indifference to his serious medical needs.  (ECF Nos. 1, 4.)  On August 7, 2017, Plaintiff filed an Amended Complaint.  (ECF No. 7.)  On September 27, 2018, Defendants filed a Motion to Dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  (ECF No. 15.)  The Court granted Defendants' Motion to Dismiss on February 2, 2018, as to Defendants Tim Buchanan, Charles Bradley, and Vanessa Sawyer.  (ECF No. 32.)  The Court did not dismiss the case as to the unnamed Defendants "FMC Transport Staff" and "FMC Doctors and Staff."  (*Id.*)  On February 5, 2018, the Court granted Plaintiff sixty (60) days to engage in further discovery or to amend his Complaint in order to identify the unnamed Defendants.  (ECF No. 33.)  Interested Party, the State of Ohio, made a limited appearance pertaining to the unnamed Defendants.  (ECF No. 36.)

On March 26, 2018, Plaintiff requested an extension of time to file an Amended Complaint.  (ECF No. 35.)  The Court granted Plaintiff's Motion and permitted him leave to file his Amended Complaint on or before June 8, 2018.[2]  (ECF No. 38.)  On June 22, 2018, Plaintiff

---

Registration numbers shall be included immediately after the name of Ohio counsel in the signature and address block on all filings.").

[2] On June 4, 2018, Plaintiff again requested an extension to file an amended complaint.  (ECF No. 41.)  The Court again granted Plaintiff's Motion and permitted him to file an amended complaint on or before July 28, 2018.  (ECF No. 42.)  On September 24, 2018, Plaintiff requested sixty (60) additional days to file an amended complaint, with the sixty (60) days to begin after he filed a Response in Opposition to the Motion to Dismiss.  (ECF No. 50.)  The Court permitted Plaintiff to have until November 26, 2018 by which to file an amended complaint.  (ECF No. 52.)  On November 20, 2018, Plaintiff again requested sixty (60) additional days to file an amended complaint.  (ECF No. 54.)  The Court granted Plaintiff's Motion and permitted Plaintiff to have until January 27, 2019 by which to file an amended complaint.  (ECF No. 55.)  On January 23, 2019, Plaintiff again requested sixty (60) additional days to file an amended complaint, with the sixty (60) days to begin after the Court ruled on the Motion to Dismiss.  (ECF No. 58.)  The Court granted Plaintiff's Motion.  (ECF No. 59.)  On March 21, 2019, Plaintiff filed a Motion requesting sixty (60) additional days to amend his

filed a Motion for an Order Compelling an Answer and Discovery Response. (ECF No. 43.)

Plaintiff alleged that the State of Ohio had failed to respond to a letter he sent its counsel

requesting assistance in naming the unnamed Defendants. (*Id.*) Plaintiff therefore moved for an

order directing the State of Ohio to produce any and all documents pertaining to the event in

question. (*Id.*) The State of Ohio responded on July 6, 2018, opposing the Motion to compel

discovery. (ECF No. 44.) On July 25, 2018, the Court granted Plaintiff's Motion, finding that

the State of Ohio's attempts to partially meet Plaintiff's discovery request were woefully

inadequate. (ECF No. 45.) The Court ordered the State of Ohio to fully comply with Plaintiff's

discovery request by informing the Court by written notice on the docket of the results of its

compliance within thirty (30) days of the date of the Order. (*Id.*) The State of Ohio responded to

the Order on August 24, 2018 with the results of its compliance with the discovery request and a

motion to dismiss for lack of jurisdiction. (ECF No. 48.)

---

complaint. (ECF No. 66.) The Court denied Plaintiff's Motion without prejudice given that
the Motion to Dismiss remained pending, and Plaintiff's sixty (60) additional days were not to
begin until the Court had ruled on the Motion to Dismiss. (ECF No. 67.) The Court indicated
that it would establish a specific deadline by which Plaintiff should amend his complaint, if
appropriate, after final disposition of the Motion to Dismiss. (*Id.*) On May 30, 2019, the
presiding United States District Judge issued an Order converting the Motion to Dismiss to a
Motion for Summary Judgment, finding the Report and Recommendation moot, "insofar as it
recommended granting the motion to dismiss which has now been converted to a motion for
summary judgment." (Motion for Summary Judgment.) Accordingly, there has not been a
final disposition of the Motion to Dismiss, which has now been converted to a Motion for
Summary Judgment. The Motion is now before the Undersigned for a Report and
Recommendation. A final disposition of the Motion will occur when the presiding District
Judge issues an Order either adopting or overruling the instant Report and Recommendation.
The Court, therefore, has not provided Plaintiff with a new deadline by which to file his
amended complaint. The Court will do so, if necessary, after the final disposition of the
Motion.

The State of Ohio asserts that Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a) ("PLRA" or "the Act") before filing the instant action. (*Id.*)

On February 21, 2019, the Undersigned issued a Report and Recommendation recommending that State of Ohio's Motion to Dismiss be granted. (ECF No. 62.) On May 8, 2019, Plaintiff filed an Objection to the Report and Recommendation. (ECF No. 68.) On May 21, 2019, State of Ohio filed a Response to Plaintiff's Objection. (ECF No. 69.) On May 30, 2019, the presiding United States District Judge issued an Order converting the Motion to Dismiss to a Motion for Summary Judgment, finding the Report and Recommendation moot, "insofar as it recommended granting the motion to dismiss which has now been converted to a motion for summary judgment." (Motion for Summary Judgment.)[3] The Court permitted Plaintiff to submit evidentiary materials "relevant to the issue of exhaustion of administrative remedies and allowable under Rule 56" outside the pleadings in opposition to the State of Ohio's motion to dismiss on the ground of failure to exhaust administrative remedies within thirty (30) days of the date of the Order. (*Id.*) The Court also permitted the State of Ohio to file a Reply to any evidentiary materials submitted by Plaintiff within twenty-one (21) days of Plaintiff's filing. (*Id.*) On July 5, 2019, Plaintiff filed "Evidentiary Materials Outside the Pleadings in Opposition." (ECF No. 73.) On July 26, 2019, State of Ohio filed a Reply. (ECF No. 77.)

## II. EVIDENCE

Ohio Department of Rehabilitation and Correction ("ODRC") Assistant Chief Inspector Karen Stanforth provided an Affidavit regarding the prison grievance procedure at Plaintiff's

---

[3] The Court noted, however, that "the analysis in the report and recommendation may be relevant to the court's later consideration of the summary judgment motion on the issue of exhaustion of administrative remedies." (Motion for Summary Judgment.)

institution. (ECF No. 48, Ex. 2, "Stanforth Aff.".)[4] Assistant Chief Inspector Stanforth

explained the following:

> ODRC maintains an inmate grievance procedure that is available to all inmates regardless of their disciplinary status at each of its institution [sic]. *See* Ohio Admin. Code 5120-9-31(D). This procedure allows inmates to seek relief regarding any aspect of institutional life that directly and personally affects the grievant. This may include complaints regarding policies, procedures, conditions of confinement, or actions of institutional staff. *See* Ohio Admin. Code 5120-9-31(A).

> The inmate grievance procedure is comprised of three consecutive steps. Ohio Admin. Code 5120-9-31(K). Under step one of the procedure, the inmate submits an informal complaint to the direct supervisor of the staff member or the department most directly responsible over the subject matter concerning the inmate. *See* Ohio Admin. Code 5120-9-31(K)(1).

> If the inmate is not satisfied with the results, the inmate must proceed to step two by filing a formal grievance with the inspector of institutional services at the prison where he is confined. See Ohio Adm. [sic] Code 5120-9-31(K)(2). That inspector will investigate the matter and issue a written response to the inmate's grievance. *Id.*

> If the inmate is still dissatisfied, the inmate must proceed to the third step, which is an appeal to the Office of the Chief Inspector of ODRC. *See* Ohio Admin. Code 5120-9-31(K)(3). In circumstances where the inmate alleges misconduct on the part of the warden or inspector of institutional services at the prison where the inmate is confined, the inmate may initiate a grievance directly with the Office of the Chief Inspector. *See* Ohio Admin. Code 5120-9-31(M). There is no appeal from the Chief Inspector's decision in a direct grievance under Ohio Admin. Code 5120-9-31(M). An inmate does not exhaust his or her remedies under Ohio Admin. Code 5120-9-31 until the inmate has received a decision in an appeal to the Office of the Chief Inspector or has received a decision from the Office of the Chief Inspector as to a direct grievance alleging misconduct against the warden or inspector of institutional services.

> All inmates in the custody of ODRC are given both written and oral instructions on how to use the inmate grievance procedure including instructions on appeals to the Office of the Chief Inspector and direct grievance [sic] to that office as required by Ohio Admin. Code 5120-9-31(C).

---

[4] Assistant Chief Inspector Stanforth averred in the affidavit that as part of her job duties she handles appeals from inmates as set out in Ohio Administrative Code 5120-9-31(K) and directs grievances to the Office of the Chief Inspector of ODRC as set out in Ohio Administrative Code 5120-9-31(M). (Stanforth Aff., at ¶ 2.) Furthermore, she represented that she is the custodian of the records of said appeals and grievances. (*Id.*)

(Stanforth Aff., at ¶¶ 6-10.)  In Plaintiff's Amended Complaint, he alleged that he took

the steps of "Informal Complaint to the medical staff and then to the grievance committe [sic] in

Columbus" in response to whether he had presented the facts relating to his complaint in the

prisoner grievance procedure provided in his institution.  (ECF No. 7, at pg. 3.)  He also alleged

in his Statement of Claims: "[A] formal Grievance was prepared and submitted through proper

channels in accordance with ODRC policies and procedures, and the response from the office of

the Institutional Inspection committee was that they do not have the authority to handle

institutional problems."  (*Id.*, at pg. 8.)[5]

Assistant Chief Inspector Stanforth averred the following regarding Plaintiff's use of the

grievance procedures:

> I have reviewed the grievance records regarding Inmate Brandon Ashdown (inmate
> number A705024).  Inmate Ashdown filed five informal complaints . . . in 2015.
> He did not file any formal grievances nor did he file any appeals to the Chief
> Inspector's Office in 2015.
>
> . . .
>
> Inmate Ashdown did not pursue any of his institutional complaints in 2015 to the
> point of exhausting his administrative remedies.

(Stanforth Aff., at ¶¶ 4, 11.)  The five informal complaints to which State of Ohio refers do not

concern the alleged claims in the instant action.  (*See* ECF No. 48-2, "Plt's Grievance Hist.".)[6]

---

[5] Plaintiff attached a copy of a letter from the Correctional Institution Inspection Committee,
dated June 6, 2016, to his initial Complaint.  (ECF No. 4, at pg. 10.)  Within the letter, the
writer notes the Committee does not have decision-making authority but notes that they can
contact institutional staff on Plaintiff's behalf.  The writer also suggests actions Plaintiff may
take regarding his claims.  (*Id.*)

[6] The State of Ohio's attachments to its Motion to Dismiss, which has been converted to a
Motion for Summary Judgment, are labeled Exhibit 1 (Affidavit of Jill Glispie), Exhibit 2,
(Affidavit of Assistant Chief Inspector Karen Stanforth, R.N.), and again Exhibit 2 (Plaintiff's
Grievance History including Informal Complaint Resolutions from 2015), instead of being
labeled as Exhibit 3.

Specifically, on July 18, 2015, Plaintiff filed an informal complaint alleging that correctional officers took one of his possessions, specifically a fan, and refused to give it back to him despite that it was "[titled] in [his] name." (*Id.*)  In the "action taken" section, the staff member wrote that "[t]he inspector does not answer Informal Complaints.  You already filed a similar complaint to the shift supervisor." (*Id.*)  On July 21, 2015, Plaintiff filed an informal complaint alleging that his fan was again unfairly confiscated.  (*Id.*)  In the "action taken" section, the staff member wrote that "[a]ccording to Sgt. McKee – your fan has been returned.  If you alter it in any way, it can be taken as contraband." (*Id.*)  On August 8, 2015, Plaintiff filed two informal complaints alleging that his mail regarding a legal appeal "sat around here at [Noble Correctional Institution] for a week before it was [mailed]." (*Id.*)  In the "action taken" sections, the staff member wrote "see attached cash slip copy" and "[t]he cash slip for the postage was signed by you and Sgt McKee on 7/14/15, and processed on 7/15/15 and then mailed out.  We have no control over the USPS and how fast they deliver mail." (*Id.*)  On August 13, 2015, Plaintiff filed an informal complaint alleging that a correctional officer unfairly confiscated some of his personal possessions.  (*Id.*)  In the "action taken" section, the staff member wrote that "[Correctional Officer] Brunoni stated he did not take any medical soap, but did take the contraband ruler and homemade JP4 case, and wrote out a contraband slip.  You received an appropriate conduct report.  Part of the informal process is to send copies in a kite, so he was doing his job by reminding you to do it correctly.  It is the [correctional officer's] discretion to turn fans on/off." (*Id.*)  None of these informal complaints by Plaintiff remotely concern the incident of alleged deliberate medical indifference at issue in the instant action.

In response, Plaintiff submitted several materials.  (ECF No. 73.)  Plaintiff asserts that these materials "demonstrate that [he] has in good faith done every thing [sic] that was made

readily available to him and therefore when he has attempted to get the appropriate information, records, [e]tc. To submit to the court as evidence he has continuously received negligent responses no matter what the request or complaint was, or when the date of the request/complaint took place." (*Id.* at PAGEID # 403.) The Undersigned will address each of Plaintiff's submissions in turn.

### A. Ohio Administrative Code 5120-9-04

Plaintiff includes Ohio Administrative Code 5120-9-04 regarding "Appropriate supervision, discrimination and racial issues." (ECF No. 73-1, PAGEID # 410–11.) Plaintiff asserts that this document "was included with the Correctional Institution Inspection Committee ("CIIC") letter of response that [he] received about his complaint he sent them[.]" (ECF No. 73, at PAGEID # 404.) He further asserts that this "is a description of what staff members are to do when receiving a complaint that alleges inappropriate supervision, along with the correct process of what the Institutional Inspector is to do upon receiving a complaint about inappropriate supervision and not [e]xcluding the finding of merit of an imate['s] complaint." (*Id.*) However, this OAC regulation is not related to the allegations in Plaintiff's Amended Complaint. (*See* ECF No. 7.) The regulation defines "inappropriate supervision" as "any continuous method of annoying or needlessly harassing an inmate or group of inmates, including, but not limited to, abusive language, racial slurs, and the writing of inmate conduct reports strictly as a means of harassment." O.R.C. § 5120-9-04(B). Nowhere in Plaintiff's Amended Complaint does he allege that he endured abusive language, racial slurs, or the writing of an inmate conduct report strictly as a means of harassment. (*See* ECF No. 7.)

### B. ODRC Policy Standards

Plaintiff includes a Noble Correctional Institution copy of the ODRC policy standards for employee conduct. (ECF No. 73-2, PAGEID # 412–15.) The policy indicates that its purpose "is to provide written guidelines and notify all employees regarding the written rules of conduct that specify prohibited behavior and penalties." (*Id.* at PAGEID # 412.) Plaintiff asserts that the policy standards are included "to demonstrate how the responses or non-responses that [he] received or did not receive about any of his complaints or requests [were] not sufficient to the (ODRC) standards of employee conduct." (ECF No. 73, at PAGEID # 404.)

### C. 2014 Correctional Institution Inspection Committee Report

Plaintiff includes part of a 2014 report by the CIIC regarding an inspection of Noble Correctional Institution. (ECF No. 73-3, at PAGEID #416–19.) Plaintiff asserts that this document is included to demonstrate "that not all appropriate (ODRC) documents/forms are available to inmates at a 100% [sic] of the time, nor do inmates receive an answer/decision to their request or complaints a 100% [sic] of the time[.]" (ECF No. 73, at PAGEID # 404.) Plaintiff alleges in his Amended Complaint that he entered ODRC in April 2014 and that his surgery and transportation occurred in June 2015. (ECF No. 7.)

The CIIC report appears to have been written in August 2014. (ECF No. 73-3, at PAGEID # 416.) The report, therefore, was written before Plaintiff's alleged incident took place. State of Ohio therefore argues that Plaintiff "wants the trier of fact to engage in speculation and take a leap of faith in believing that somehow his specific case relating to post-surgery transportation complaints from 2015 is documented in the report . . . . There can be no reasonable leap of logic created without engaging in *Cirque du Soleil*-level acrobatics." (ECF

No. 77, at pg. 13 (emphasis in original).)[7]  Here, Plaintiff indicates that this was "the only yearly report that was available" and specifically includes the pages regarding the statistics on informal complaints and grievances.  At this juncture, the Court cannot say that the 2014 CIIC report submitted by Plaintiff has no probative value.  *See Ridenour*, 692 F. Supp. 2d at 844.

### D.  Blank Kite Procedure Forms

Plaintiff includes a blank Kite form to demonstrate "what a kite looks like before an inmate and the appointed institutional staff correspond with the Kite Procedure."  (ECF No. 73, at PAGEID # 405.)  He further includes a second blank Kite form to demonstrate "the changes that have occurred from the past Kite to the new Kite[.]"  (*Id.*)  Plaintiff explains the old Kite form:

> On Side (A) is the face of the KITE, an Ohio State wide Prison provided, and pre-printed for the use of inmates.  On two of the ends on the FACE of the pre-printed kite are listed five instructions of the KITE PROCEDURE.  Side (B) is a BLANK side for which incarcerated inmates are to write their complaints/issues on.  The first Blank kite form is what we used to have with a pre-glue strip on the side (B) and there is a box where the Institution staff must sign before you are allowed to turn the kite in to the proper place.

---

[7] The Court assumes State of Ohio is arguing that this document is not relevant and has no probative value.  State of Ohio's hyperbolic argument fails.  The standard for determining relevancy for evidence regarding a motion for summary judgment is "extremely liberal." *United States v. Whittington*, 455 F.3d 736, 738 (6th Cir. 2006) (citation omitted).  In determining the relevancy of evidence, "a court must not consider the weight or sufficiency of the evidence." *Ridenour v. Collins*, 692 F. Supp. 2d 827, 844 (S.D. Ohio, Feb. 10, 2010) (citing *DXS, Inc. v. Siemens Medical Systems, Inc.*, 100 F.3d 462, 475 (6th Cir. 1996)).  "[E]ven if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has the slightest probative value." *Id.* at * 844–45 (citing *DXS*, 100 F.3d at 475).  For example, in *Ridenour*, the court could not say that evidence from Plaintiff consisting of statistical reports regarding the average time served by Ohio parolees from 1977 to 2007 had no probative value, even though the statistical exhibits were not "tailored to the plaintiff's 'unique' factual circumstances" because Plaintiff offered the exhibits "to show the likelihood of increased incarceration apparently caused by changes in parole policies since his conviction and sentence" and he "made an effort to tailor the statistics to parolees in circumstances similar to his." 692 F. Supp. 2d. at 844–45.

(*Id.*)  Plaintiff explains the new Kite form:

> The glue-strip and the Issued by (staff member signature):  box are, no longer on the kites that we use on the current day to day Kite, and you will see the changes that have occurred from the past Kite to the new Kite that we are currently using on day to day.  This description of the KITE form that has not been properly filled out "see side A, & side B." is to demonstrate to all parties as of which side to look at on the rest of the KITE forms that are included with the Appendix attachments, and that has been filled out and used by Plaintiff Ashdown, is so that there are no confusions as of why the rest of the Appendix KITE forms "DO NOT" have side A, OR side B on them.  Therefor[e] Appendix D serves as a multi-purpose piece of evidence.

(*Id.*)

### E.  Blank Informal Complaint Resolution Form

Plaintiff includes a blank Informal Complaint Resolution ("ICR") form.  (ECF No. 73-5, at PAGEID # 424.)  He explains that "[t]his form is no longer in use nor is any paper form no-longer in use to file Informal Complaints/Grievances.  Do [sic] to the fact that the Informal/Grievance Procedure is to be conducted in a digital manner now on a computer called J-pay/kiosk."  (ECF No. 73, at PAGEID # 405.)

### F.  June 2015 Kites

Plaintiff includes three different Kite forms completed by him in June 2015.  (ECF No. 73-6, at PAGEID # 425–30.)  Plaintiff's first Kite is dated June 12, 2015 but time stamped June 16 6:41 AM and addressed to "Mrs. Sawyer."[8]  (*Id.* at PAGEID # 425.)  Plaintiff wrote in the Kite:

> I was told to Kite you about this issue, I Had Hernia surgery June 5th, since I've Been Back at noble the medical staff refused to give me Ibuprofen cuz I Had money on my account.  They only sell 50 milligram tablets!!  Why should I Have to take

---

[8] "Mrs. Sawyer" is presumably Vanessa Sawyer, who Plaintiff named as a Defendant in his Amended Complaint.  He alleged that she was the head of the medical unit at Noble Correctional Institution.  (ECF No. 7.)  The Court dismissed Defendant Sawyer on February 2, 2018 when the Court granted Defendants Charles Bradley, Tim Buchanan, and Vanessa Sawyer's Motion to Dismiss.  (ECF No. 32.)

ten pills for when medical should have prescribed me 1000 milligrams for the amount of pain my testicals [sic] are in!! That is cruel + unusual treatment, + or Human torture. I'm also writing Colombus [sic] + the Public defenders office, please send me a copy Back of this Kite!! Thank You

(*Id.* at PAGEID # 426.) The Kite also has handwriting that differs from Plaintiff's which states

the following:

Commissary has Ibuprofen that comes in 200 mg tablets or capsules their [sic] maybe 50 tablets in one bottle. Please check again.

You recently had surgery: left inguinal hernia repair completed on 6/5/15 without complication at OSU sent to FMC on 6/5/15 given Tylenol #3 post-op

(400 mg twice per day = 800 mg)

Ibuprofen 200 mg (10 packs given to start) (stated pain 3-4 out of 10 on return to NCI)

On 6/10/15 returned to NCI seen in medical and evaluated by nurse and ALP.

Medical restrictions
No lifting > 10 lbs x 6 wks
[Illegible] x 4 months
Med. [illegible] x 5 days til (6/15/16)

Follow up in surgical clinic if needed in 2 wks
Motrin 400 mg twice daily as needed (10 packs given)

(*Id.*)

Plaintiff's second Kite is dated June 12, 2015 but time stamped June 16 6:44 AM and

addressed to "Mrs. Sawyer." (*Id.* at PAGEID # 427.) Plaintiff wrote in the Kite:

I was told by a NCI captain to write my complaint on a Kite to you since there are no Informal/Grievance forms available + that your [sic] the Head of the Medical of NCI. Ever since I've returned back to NCI From FMC after Having a Hernia surgery at the OSU Hospital, I have had Issues urinating! After Having surgery at OSU I was taken in a Wheel chair at 12:49 pm to a Holding cage on the entry level of the Hospital + was told to get out of my Wheel chair + to get on a wooden bench by an FMC Transport Officer which the bench had no back support! I was left there untill [sic] after 3:45 pm + I did not return back to the FMC Facility untill [sic] 4:09 pm. This is at the very least inappropriate supervision, untimely medical transport, + Inappropriate medical treatment. Which are all under ODRC policies!

(*Id.* at PAGEID # 428.)

Plaintiff's third Kite is dated June 18, 2015 with a stamp on the second page indicating "Received Jun 22 2015 NCI Inspector" and addressed on the first page to "Inspector," though the word "Inspector" has cross-out marks through it. (*Id.* at PAGEID # 429.) Plaintiff wrote in the Kite:

> On June 12th 2015 I wrote a complaint to Mrs. Sawyer on a Kite about an Issue of the doctors here at NCI not giving me any medication after my recent return from FMC/OSU From having Hernia surgery. After five days I received a beligerant [sic] response. On the same day June 12th 2015 I also sent Mrs. Sawyer another complaint on a Kite like I'm doing now on a Kite because there are no Informal/greivence [sic] forms on the compound, in that complaint I stated that after Having surgery performed on me on June 5th 2015 at 12:40 pm. I was wheeled Down to the entry level of OSU in a wheel chair I was then brought to a Holding cage where a transporting officer stated to me to get out of that wheel chair + get on that bench! I told Him I just had stomach surgery. He said He didn't care. I was also belly chaned [sic] / hand cuffed + Feet shackled. I was there for more than 3 hours + didn't arrive back to FMC Facility untill [sic] 4:09 pm. This was a very untimely transport, Inappropriate supervision, + Inappropriate medical treatment. Mrs. Sawyer just put return on my Kite + didn't even respond! Thank You

(*Id.* at PAGEID # 430.) Plaintiff asserts the following regarding the third Kite:

> Plaintiff Ashdown was spoken to in person by the NCI Institutional Inspector Aufdenkamp at the date & time of the complaint, and [Aufdenkamp's] response was "that he does not have decision making authority to answer this complaint and to write the people in Columbus". When Plaintiff Ashdown asked him to write on the KITE complaint for a response, Aufdenkamp said that his stamp was good enough.

(ECF No. 73, at PAGEID # 406.)

### G. Plaintiff's Complaints to the Chief Inspector's Office, ODRC, and CIIC

Plaintiff includes a typed "complaint" dated July 9, 2015 which Plaintiff asserts was submitted to the Chief Inspectors Office. (ECF No. 73, at PAGEID # 406; ECF No. 73-7, at PAGEID # 431–37.) The complaint reads:

> To Chief Inspector's Office,

My Name is Brandon Ashdown and I am currently incarcerated at the Noble Correctional Institution (NCI) in Caldwell, Ohio serving a [sic] 8 year prison term under inmate number A705-024. The reason for this correspondence is to share with you the cruel and unusual punishment being handed down by the medical personal [sic] employed by the Ohio Department of Rehabilitation and Correction (ODRC); Franklin Medical Center (FMC); and NCI. Thus I am in need of representation in perhaps filing a civil claim for the malice treatment impose [sic] upon me by said employee's [sic].

On June 5, 2015, I was transported from the NCI to the FMC in Columbus, Ohio for temporary housing up to and until surgery was perform [sic] to remove a hernia which would be performed by the Ohio State University Medical Center (OSU). After surgery was completed at approximately 11:30 A.M., I was given an hour in bed to get my bearings together. At 12:49 P.M., I was handcuffed, belly chained and shackled, placed in a wheel chair and wheeled to a [sic] inmate holding cage. I was then ordered by the Correction Officer (CO) to get out of the wheel chair and sit on a wooden bench running the length of the cage wall. The bench was only a foot wide from the wall with no back support. I informed the CO that I just had stomach surgery and I can't sit on that bench because the pain would be unbearable. The CO told me that I couldn't keep the wheel chair and he didn't care about my surgery, "get on that bench". I sat on the bench for 3 hours, until 3:45 when I was finally transported back to FMC.

Sitting on that bench for 3 hours caused me horrendous amounts of pain. I was at FMC for 3 days and even though I was prescribed Percaset [sic] 5's as a pain reliever, FMC took it upon themselves without the authority of the prescribing doctor, substituted the Percaset's [sic] for 1 Tylenol 3 two times a day. The substitution did absolutely nothing to relieve the pain I was in.

On June 10, 2015 I was being discharged from FMC and transported back to NCI. At 7:30 A.M. I was told to pack my bedding and belongings up. I was again handcuffed, belly chained and shackled, placed in a room with a hard steel bench and made to sit there in agonizing pain for 6 ½ hours, till after 2:00 P.M. When I was finally transported back to NCI. I arrived at NCI at around 5:00 P.M. and the Doctor for NCI had already went home for the day. The following day, June 11, 2015, at around 1:30 P.M. I finally got to see the doctor. I was not given a prescription for pain, actually discontinued my Tylenol 3's, no anti-inflammatory or anything. Two weeks later, I wrote an informal complaint explaining the pain I was experiencing and received a [sic] unintelligent response, however, I was given 30 tables [sic] of 500mg. Of Naproxin and nothing more.

My stomach had ripped through my muscles and had expanded for days, worsening. The surgery was to push my stomach back into place, sow the rip up in the abdomen area, thus requiring bed rest, restrictive movement and pain reliever, not headache medications. I have went through all of DRC Policies and Administrative Rules

and have not found a rule or policy giving FMC or NCI the authority to prescribe a different medication from the medication prescribed by the doctor that performed the surgery. The treatment I endured, the pain I suffered, was clearly what our fore fathers had in mind by the enactment of the 8th Amendment of the United States Constitution which protects us from cruel and unusual punishment.

For anyone who had to endure surgery knows what it feels like to be cut open, sewn up from the inside out, and once their pain medication begins to ware [sic] off, the pain you feel from that area. I had to endure two weeks of pain because FMC and NCI refused to give me the pain reliever the original doctor prescribed. Just to give you the attitude the medical staff have at NCI, I heard one of the nurses tell another inmate that he doesn't deserve medical treatment because his [sic] is a [sic] inmate. That attitude is what is running medical services here at NCI. With that attitude, it was no wonder two weeks later that I finally received pain reliever that was not Tylenol 3's, however, with the staph infections running a mock [sic] at this institution and my snitched [sic] up stomach area, a [sic] inflammatory or penicillin should have been prescribed to fight out and [sic] infections, however, was not.

. . .

There are so many inappropriate things going on at FMC and NCI that effects [sic] our safety, health and mental welfare.

I know there is something that can be done regarding these matters, I just don't know what that something is. Even if I can not obtain financial gain from this situation, at least DRC is made aware of the current inappropriate treatment of their patience [sic] and inmates. Just perhaps DRC will implement changes to their medical staff, training and procedures. I have been through so much stress, hardship, emotional distress, anxiety, physical pain during this incarceration. I was sent to prison to be punished, not to be punished while in prison and treated inhumanly.

For these reasons stated above, I am requesting assistance in filing a law suite [sic] against DRC; NCI; and FMC. I am hoping that you can and are willing to assist me in this matter.

I look forward to hearing from you soon. Your cooperation in this matter is appreciated.

(ECF No. 73-7, at PAGEID # 431–37.)

Plaintiff also includes the first page of a typed "complaint" dated March 1, 2015 which

Plaintiff asserts was submitted to the Chief Inspectors Office, Director of ODRC, and the CCI.

(ECF No. 73, at PAGEID # 406; ECF No. 73-7, at PAGEID # 438.) Plaintiff notes that this

complaint "did vary [from the July 9, 2015 complaint] with different complaints added to it, and even some complaints taken out of it. . . . However, the complaint about the inadequate medical treatment that Plaintiff Ashdown received was never removed at any point of the modifications that were done upon it." (ECF No. 73, at PAGEID # 406.) The part of the March 1, 2015 complaint that Plaintiff submitted reads as follows:

> To Chief Inspector, Director, and CIIC
>
> My Name is Brandon Ashdown and I am currently incarcerated at the Noble Correctional Institution (NCI) in Caldwell, Ohio serving a [sic] 8 year prison term under inmate number A705-024. The reason for this correspondence is to share with you the cruel and unusual punishment being handed down by the medical personal [sic] employed by the Ohio Department of Rehabilitation and Correction (ODRC); Franklin Medical Center (FMC); and NCI. Thus I am in need of representation in perhaps filing a civil claim for the malice treatment impose [sic] upon me by said employee's [sic].
>
> On June 5, 2015, I was transported from the NCI to the FMC in Columbus, Ohio for temporary housing up to and until surgery was perform [sic] to remove a hernia which would be performed by the Ohio State University Medical Center (OSU). After surgery was completed at approximately 11:30 A.M., I was given an hour in bed to get my bearings together. At 12:49 P.M., I was handcuffed, belly chained and shackled, placed

(ECF No. 73-7, at PAGEID # 438.)

## H. April 2019 Kite

Plaintiff includes a Kite form completed by him and dated April 15, 2019. (ECF No. 73-8, at PAGEID # 439–40.) The Kite is addressed to "Inst. Inspector Starr" and it does not bear a time stamp. (*Id.* at PAGEID # 439.) Plaintiff wrote in the Kite:

> I need a copy of any Informal complaint Rather If It was on the <u>ICR</u> Form or the <u>Kite</u> Form that I turned in From June of 2014 to the Date of August 1st of 2015. If they exist Please + thank you.

(*Id.* at PAGEID # 440 (underlining in original).) A note on the same form signed by Inspector Starr reads "This is not possible." (*Id.*) Plaintiff asserts that he includes this Kite "as evidence to

demonstrate that [he] wanted to inform this Honorable Court that (ODRC) employees are not very proper with their responses to inmates, along with their inaccuracy of keeping records." (ECF No. 73, at PAGEID # 407.)  State of Ohio asserts in its Reply that "a kite from 2019 has no bearing or relevance to [Plaintiff's] claim that he exhausted administrative remedies or that he was thwarted."  (ECF No. 77, at pg. 15.)

### I.  July 2015 Kite

Plaintiff includes a Kite form completed by him and dated July 21, 2019.  (ECF No. 73-9, at PAGEID # 441–42.)  The Kite is addressed to "investigator" though the word "investigator" has cross-out marks through it.  (*Id.* at PAGEID # 441.)  It does not bear a time stamp.  (*Id.*)  Plaintiff wrote in the Kite:

> I went to Have surgery at FMC on 6-4-15, I Had them transfer my phone pin # there so I could use the phone! It is no [sic] 7-21-15 + I still can't use the telephone!  I Have called *1995 3 to 4 times + still I can't use the phone to check on my children! I was told By my unit manager, + case manager to Kite you, Because your [sic] the only person on the prison grounds that Has anything to Do with the telephones for the inmates!  Please Help my situation?  Thank you!

(*Id.* at PAGEID # 442.)  The Kite also has handwriting that is different from Plaintiff's, with an illegible signature, that states the following:

> Phone status is active.  Pin # is 9155.  If you continue to have problems calling you have to call *1995, leave name, # + a brief message regarding the problem.  Speak clearly when leaving your message + information.

(*Id.*)

Plaintiff asserts that this Kite is included "as evidence to demonstrate that even though it is time dated stamped by a high ranking (NCI) official staff member, it was not properly recorded as a complaint filed by an inmate."  (ECF No. 73, at PAGEID # 407.)  In its Reply, State of Ohio asserts that this Kite is "simply irrelevant" and that Plaintiff "simply want [sic] to point to a murky conspiracy related to the time-stamp."  (ECF No. 77, at pg. 15.)  State of Ohio

further asserts that "[t]his is speculation and misdirection and, bottom line, has no bearing on

[Plaintiff's] claimed lack of ICRs or being thwarted." (*Id.*)


**J. June 2019 Kite**

Plaintiff includes a Kite form completed by him and dated June 8, 2019. (ECF No. 73-

10, at PAGEID # 443–44.) The Kite is addressed to "Lt. McConkey" and does not bear a time

stamp. (*Id.* at PAGEID # 443.) Plaintiff wrote in the Kite:

> I was told by Mrs. Sawyer to ask you about the medical transport procedure
> including the appropriate policies included about medical transport? Do prison
> staff Have to sign in/out when picking an Inmate up to transport them so that there
> is record of who's accountable for the Inmates safety + well Being, etc. All things
> + policies relating to such transport matters please? Thank you

(*Id.* at PAGEID # 444.) The Kite also has handwriting that is different from Plaintiff's, with no

signature, that states the following:

> There are certain officers assigned to transportation who take scheduled
> appointments. Any officer can take an emergency.

(*Id.*)

Plaintiff asserts that he included this Kite "as evidence to demonstrate that [he] wanted to

inform this Honorable Court that (ODRC) employees are not very proper with their responses to

inmates, along with their inaccuracy of following (ODRC) policy." (ECF No. 73, at PAGEID #

407.) In its Reply, State of Ohio asserts that "[a]ssuming *arguendo* that the institution, at

present, maintains a transportation officer list this kite reveals nothing nor demonstrates anything

relating to [Plaintiff's] grievance procedure and failure to follow the exhaustion steps." (ECF

No. 77, at pg. 15–16.)

**K. Plaintiff's Inmate Grievances History**

Plaintiff includes a screenshot of his Grievance History. (ECF No. 73-11, at PAGEID # 445.) The same screenshot was included in the State of Ohio's Motion to Dismiss, now converted to a Motion for Summary Judgment. (ECF No. 48-2 (note that in State of Ohio's Motion, Plaintiff's Grievance History was improperly labeled as Exhibit 2, instead of Exhibit 3).) Plaintiff asserts that this evidence "is to verify that none of [his] complaints that are included in [his evidentiary materials] were included in the discovery status report." (ECF No. 73, at PAGEID # 407.)

**L. August 2015 Informal Complaint Resolutions**

Plaintiff includes two ICRs completed by him on August 8, 2015. (ECF No. 73-12, at PAGEID # 446–47.) These two ICRs were included in the State of Ohio's Motion to Dismiss, now converted to a Motion for Summary Judgment. (ECF No. 48-2, at PAGEID # 233–34.) Plaintiff asserts that he includes these reports to demonstrate that the same time stamp that appeared on his June 18, 2015 Kite, which states "Received [specific date] NCI Inspector[,]" was also used on these two ICRs. (ECF No. 73-6, at PAGEID # 429; ECF No. 73-12, at PAGEID # 446–47.) Plaintiff further asserts that "[t]his stamp verifies that the NCI Inspector used their institutional provided stamp on the KITE form and the ICR form." (ECF No. 73, at PAGEID # 407.) Furthermore, Plaintiff asserts that despite the complaints about his legal mail being delayed by NCI, "no appropriate investigation was [ever] performed as is listed and pursuant to [Ohio Administrative Code 5120-9-04] or [ODRC Policy Standards]" and that this "is included as evidence to demonstrate that [he] wanted to inform this Honorable Court that (ODRC) employees are not very proper with their responses to inmates, along with their accuracy of following (ODRC) policy especially when it comes to a serious complaint." (*Id.* at PAGEID # 407–08.)

State of Ohio asserts in their Reply that Plaintiff is arguing that because the stamp is the same "his kites now are 'transmuted' into ICR grievance forms." (ECF No. 77, at pg. 16.) Plaintiff's argument, however, appears to be that ODRC never properly investigated his complaints regarding delayed mail, and he is using these forms to demonstrate that ODRC is not following policy. (*See* ECF No. 73, at PAGEID # 407–08.) The Court makes no judgment as to the merits of Plaintiff's particular argument at this juncture, except to say that State of Ohio appears to have misconstrued what Plaintiff is asserting. Alhough State of Ohio asserts that "any claimed relevance of [the August 2015 ICR evidence] is anemic[,]" it included the exact same ICR forms in its Motion for Summary Judgment. (ECF No. 77, at pg. 17; ECF No. 48-2, at PAGEID # 233–34.)

### M. April 2019 Kites

Plaintiff includes two Kite forms completed by him and dated April 11, 2019. (ECF No. 73-13, at PAGEID # 448–51.) One Kite is addressed to "Mrs. Sawyer Medical" and bears two time stamps, one indicating "Apr 12 am 11:48" and one indicating "Apr 12 am 7:07." (*Id.* at PAGID # 448.) Plaintiff wrote in this Kite:

> I need All of My Medical Records From the Date of 5-1-15 to the Recent Date of 4-11-19. Thank You

(*Id.* at PAGEID # 449 (underlining in original).) The Kite also has handwriting that is different from Plaintiff's, with Vanessa Sawyer's signature, that states the following:

> Mr. Ashdown,
> Per the Confidentiality of Medical Record Policy, copies of medical records are released only at the written request of a licensed lawyer or physician.

(*Id.*) The other Kite has all of the information on the front page redacted and does not include a time stamp. (*Id.* at PAGEID # 450.) Plaintiff wrote in this Kite:

> I need <u>All</u> of My Medical Records for legal Reasons From the Date of 5-1-15 to the
> Recent Date of 4-11-19

(*Id.* at PAGEID # 451 (underlining in original).)  The Kite also has handwriting that is different

from Plaintiff's, with the signature of "Mr. Nickell," that states the following:

> According to Policy 07-ORD-11, you may Kite the HCA and sit down to view your
> medical records once per quarter.  During this review you are allowed to take notes
> by pencil.  You may also have your records requested from Columbus through the
> proper channels.  (Disclosure/Release of Information)

(*Id.*)

Plaintiff asserts that he includes these two Kites to demonstrate the "entirely different"

responses he received.  He further asserts that these Kites are "included as evidence to

demonstrate that Plaintiff Ashdown wanted to inform this Honorable Court that (ODRC)

employees are not very proper with their responses to inmates, along with their accuracy of

following (ODRC) policy[.]"  (ECF No. 73, at PAGEID # 408.)  Again, State of Ohio asserts that

this evidence is "not relevant to the case at hand."  (ECF No. 77, at pg. 17.)

### N.  Plaintiff's Personal Review of His Medical Records

Plaintiff includes a typed version of the handwritten notes he took while reviewing his

medical records.  (ECF No. 73-14, at PAGEID # 452–53.)  State of Ohio asserts in its Reply that

Plaintiff "easily could have arranged for copies of his medical records by following the

appropriate procedure."  (ECF No. 77, at pg. 17.)  However, State of Ohio does not cite to or

explain what the "appropriate procedure" would be.  (*Id.*)  Moreover, Plaintiff did follow the

exact procedure that was explained to him in the response to his April 2019 Kite.  (ECF No. 73-

13, at PAGEID # 451 ("According to Policy 07-ORD-11, you may Kite the HCA and sit down to

view your medical records once per quarter.  During this review you are allowed to take notes by

pencil.").)  State of Ohio also asserts that Plaintiff did not submit his notes under affidavit or

declaration.  At this juncture, the Undersigned finds that Plaintiff's medical records, and

therefore his typed notes regarding his medical records, are not relevant to the issue of whether

Plaintiff fulfilled the exhaustion requirement.  Accordingly, the Undersigned will not use

Plaintiff's typed notes in making a recommendation on State of Ohio's Motion for Summary

Judgment.

### III.    STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment

if the movant shows that there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  The burden of proving that no genuine issue of material

fact exists falls on the moving party, "and the court must draw all reasonable inferences in the

light most favorable to the nonmoving party."  *Stransberry v. Air Wisconsin Airlines Corp.*, 651

F.3d 482, 486 (6th Cir. 2011) (citing *Vaughn v. Lawrenceburg Power Sys.*, 269 F.3d 703, 710

(6th Cir. 2001); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address

another party's assertion of fact" then the Court may "consider the fact undisputed for purposes

of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific

facts showing that there is a genuine issue for trial.'"  *Kimble v. Wasylyshyn*, 439 F. App'x 492,

495 (6th Cir. 2011) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317-324 (1986)); *see also* Fed. R.

Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to

particular parts of materials in the record").  "The nonmovant must, however 'do more than

simply show that there is some metaphysical doubt as to the material facts,'. . . there must be

evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to

create a 'genuine' dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cty.*, 432 F. App'x 435, 441 (6th Cir. 2011) (citations omitted).

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party." *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stransberry*, 651 F.3d at 486 (citing *Celotex*, 477 U.S. at 322–23).

## IV.    ANALYSIS

The PLRA was developed in part to address the large number of prisoner complaints filed in federal court. *Jones v. Bock*, 549 U.S. 199, 202 (2007).[9] The Act "mandates early judicial screening of prisoner complaints and requires prisoners to exhaust prison grievance procedures before filing suit." *Id.* (citing 42 U.S.C. § 1997e(a)). The exhaustion provision of the PLRA provides: "No action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citing *Wilson v. Seiter*, 501 U.S. 294, 299 n.1 (1991)). Furthermore, "[t]here is no question that exhaustion is mandatory under the

_____

[9] "Prisoner litigation continues to 'account for an outsized share of filings' in federal district courts." *Jones*, 549 U.S. at 203 (citing *Woodford v. Ngo*, 548 U.S. 81, 94 n.4 (2006)).

PLRA and that unexhausted claims cannot be brought in court." *Jones*, 549 U.S. at 204 (citing *Porter*, 534 U.S. at 524). Indeed, "[e]xhaustion is no longer left to the discretion of the district court, but is mandatory." *Woodford v. Ngo*, 548 U.S. 81, 85 (2006) (citing *Booth v. Churner*, 532 U.S. 731, 739 (2001)).[10]

The exhaustion requirement of the PLRA is strict, "not to be harsh on prisoners," but rather "to further the important goals behind the law [by allowing] prison officials 'a fair opportunity' to address grievances on the merits, to correct prison errors that can and should be corrected, and to create an administrative record for those disputes that eventually end up in court." *Napier v. Laurel County, Ky.*, 636 F.3d 218, 226 (6th Cir. 2011) (citing *Reed–Bey v. Pramstaller*, 603 F.3d 322, 324 (6th Cir. 2010)). Indeed, the requirement of exhaustion "allows prison officials an opportunity to resolve disputes concerning the exercise of their responsibilities before being haled into court." *Jones*, 549 U.S. at 204.

A prisoner need exhaust only those administrative remedies that are "available" to him. *See, e.g.*, 42 U.S.C. § 1997e(a); *Napier*, 636 F.3d at 222–23. Whether a process is "available" under the PLRA frequently turns on whether a grievance procedure was available on its face even if the prisoner subjectively believes that the procedure would be futile. *Napier*, 636 F.3d at 224. Courts have found a grievance procedure "unavailable" when prison officials "have somehow thwarted" an inmate's attempts at exhaustion. *Brock v. Kenton County*, 93 F. App'x 793, 798 (6th Cir. 2004); *see also Himmelreich v. Fed. Bureau of Prisons*, 766 F.3d 576, 578

---

[10] "Prisoners must now exhaust all 'available' remedies, not just those that meet federal standards." *Woodford*, 548 U.S. at 85; *see also Hopkins v. Ohio Dep't of Corr.*, 84 F. App'x 526, 527 (6th Cir. 2003) ("When a prisoner fails to exhaust his administrative remedies before filing a civil rights complaint in federal court, or only partially exhausts administrative remedies, dismissal of the complaint is appropriate.") (citing 42 U.S.C. § 1997e(a); *White v. McGinnis*, 131 F.3d 593, 595 (6th Cir. 1997)).

(6th Cir. 2014) ("[W]e have excused a prisoner's lack of complete compliance when the improper actions of prison officials render the administrative remedies functionally unavailable.").

Nevertheless, the prisoner must still "make some affirmative efforts to comply with the administrative procedure" before a court will consider whether the procedure was unavailable. *Brock*, 93 F. App'x at 798; *see also Napier*, 636 F.3d at 223 ("The Sixth Circuit requires some affirmative efforts to comply with the administrative procedures before analyzing whether the facility rendered these remedies unavailable.") (internal quotations and citations omitted). Courts analyze "whether an inmate's efforts to exhaust were sufficient under the circumstances[.]" *Napier*, 636 F.3d at 224. In making this determination, courts consider whether a reasonable jury could conclude that defendants' actions and/or statements "would deter a person of ordinary firmness from continuing with the grievance process." *Himmelreich*, 766 F.3d at 578. What is necessary to comply with exhausting the administrative remedies is determined by the "prison's requirements, and not the PLRA[.]" *Jones*, 549 U.S. at 218. "An inmate exhausts a claim by taking advantage of each step the prison holds out for resolving the claim internally and by following the 'critical procedural rules' of the prison's grievance process to permit prison officials to review and, if necessary, correct the grievance 'on the merits' in the first instance." *Reed–Bey*, 603 F.3d 324 (citing *Woodford*, 548 U.S. at 90).

Non-exhaustion is an affirmative defense under the PLRA, with the burden of proof falling on a defendant, in this case State of Ohio. *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016) (citing *Risher v. Lappin*, 639 F.3d 236, 240 (6th Cir. 2011)). Thus, summary judgment is appropriate only if State of Ohio establishes the absence of a "genuine dispute as to any material fact" regarding non-exhaustion. *Id.* (citing *Risher*, 639 F.3d at 240) (quoting Fed.

R. Civ. P. 56(a)). Here, because Plaintiff was a prisoner of the state at the time he filed the instant action, he is subject to the PLRA's requirements. *See* 42 U.S.C. § 1997e(a); *see also Napier*, 636 F.3d at 222 (noting that the PLRA applies to an inmate "in any jail, prison, or other correctional facility").

ODRC Assistant Chief Inspector Karen Stanforth explained the three-step grievance procedure in her Affidavit:

> Step One: "[T]he inmate submits an informal complaint to the direct supervisor of the staff member or the department most directly responsible over the subject matter concerning the inmate."

> Step Two: "[F]iling a formal grievance with the inspector of institutional services at the prison where [the inmate] is confined."

> Step Three: "[A]n appeal to the Office of the Chief Inspector of ODRC."

(Stanforth Aff., at ¶¶ 7–9.) Ohio Administrative Code § 5120-9-31 lays out the three-step process in more detail:

> (1) The filing of an informal complaint – step one:

>> Within fourteen calendar days of the date of the event giving rise to the complaint, the inmate shall file an informal complaint to the direct supervisor of the staff member, or department most directly responsible for the particular subject matter of the complaint. Staff shall respond in writing within seven calendar days of receipt of the informal complaint. If the inmate has not received a written response from the staff member within a reasonable time, the inmate should immediately contact the inspector of institutional services either in writing or during regular open office hours. The inspector of institutional services shall take prompt action to ensure that a written response is provided to the informal complaint within four calendar days. If a response is not provided by the end of the fourth day, the informal complaint step is automatically waived. Informal complaint responses should reflect an understanding of the inmate's complaint, be responsive to the issue, cite any relevant departmental or institutional rules or policies and specify the action taken, if any. The inspector of institutional services shall monitor staff compliance with the informal complaint process. Any pattern of non-compliance by staff shall be reported to the warden for appropriate action. The

filing of an informal complaint may be waived if it is determined by the inspector of institutional services that there is a substantial risk of physical injury to the grievant, the complaint is filed pursuant to rule 5120-9-03 or 5120-9-04 of the Administrative Code, paragraph (H) of this rule, or for other good cause.

(2) The filing of the notification of grievance – step two:

If the inmate is dissatisfied with the informal complaint response, or the informal complaint process has been waived, the inmate may obtain a notification of grievance form from the inspector of institutional services. All inmate grievances must be filed by the inmate no later than fourteen calendar days from the date of the informal complaint response or waiver of the informal complaint step. The inspector of institutional services may also waive the timeframe for the filing of the notification of grievance, for good cause. The inspector of institutional services shall provide a written response to the grievance within fourteen calendar days of receipt. The written response shall summarize the inmate's complaint, describe what steps were taken to investigate the complaint and the inspector of institutional service's findings and decision. The inspector of institutional services may extend the time in which to respond, for good cause, with notice to the inmate. The chief inspector or designee shall be notified of all extensions. Any extension exceeding twenty-eight calendar days from the date the response was due must be approved by the chief inspector or designee. Expedited responses shall be made to those grievances that, as determined by the inspector of institutional services, present a substantial risk of physical injury to the grievant or for other good cause.

(3) The filing of an appeal of the disposition of grievance – step three:

If the inmate is dissatisfied with the disposition of grievance, the inmate may request an appeal form from the inspector of institutional services. The appeal must then be filed to the office of the chief inspector within fourteen calendar days of the date of the disposition of grievance. For good cause the chief inspector or designee(s) may waive such time limits. The chief inspector or designee(s) shall provide a written response within thirty calendar days of receipt of the appeal. The chief inspector or designee(s) may extend the time in which to respond for good cause, with notice to the inmate. The decision of the chief inspector or designee is final. Grievance appeals concerning medical diagnosis or a specific course of treatment shall be investigated and responded to by a health care professional.

O.A.C. § 5120-9-31(K)(1), (2), & (3).[11]

---

[11] The current procedure is located at Ohio Admin. Code 5120-9-31(J)(1), (2), & (3) and includes minor changes to the original text, with an effective date of April 1, 2019.

Plaintiff asserts that he completed each of these steps with his Kite on June 12, 2015 qualifying under step one (ECF No. 73-6, at PAGEID #427–28), his Kite on June 18, 2015 qualifying under step two (*Id.* at PAGEID # 429–30), and his typed "complaints" on July 9, 2015 and March 1, 2016 submitted to the Chief Inspectors Office, Director of ODRC, and the CIIC qualifying under step three (*Id.* at PAGEID # 431–38). (*See* ECF No. 73, at PAGEID # 406.) Furthermore, Plaintiff asserts that on June 12, 2015 and June 18, 2015, no ICR or Notification of Grievance ("NOG") forms were available. (ECF No. 73-6, at PAGEID # 428 ("I was told by a NCI captain to write my complaint on a Kite to you since there are no Informal/Grievance forms available[.]); 430 ("On the same day June 12th 2015 I also sent Mrs. Sawyer another complaint on a Kite like I'm doing now on a Kite because there are no Informal/greivence [sic] forms on the compound[.]").) Additionally, Plaintiff asserts that he was told in person by the NCI Institutional Inspector Aufdenkamp on June 18, 2015 that Inspector Aufdenkamp "does not have decision making authority to answer [Plaintiff's] complaint" and that "his stamp [is] good enough" for a response, as opposed to Inspector Aufdenkamp writing that information as on the Kite form itself. (ECF No. 73, at PAGEID # 406.)

State of Ohio argues that Plaintiff's use of ICR forms to document other complaints belies his assertion that ICR forms were not available. (*See* ECF No. 77, at pg. 18–19.) However, the five ICRs that the State of Ohio upon which it relies came after the two June 2015 Kites written by Plaintiff indicating that there were no ICR forms available. (*See* ECF No. 48-2, at PAGEID # 231–35.) State of Ohio asks the Court to presume that because Plaintiff filed an ICR on July 18, 2015 (a month after his second Kite indicating that no ICF forms were available), he had access to ICR forms and simply chose not to use them in this instance. State

of Ohio further contends that Plaintiff was obviously "quite familiar" with the ICR process, given that he filed ICRs not related to the instant case. (*See* ECF No. 77, at pg. 24.)

State of Ohio apparently argues that Plaintiff cannot claim ignorance of the procedure of using ICR forms. It is just as likely, however, that the fact that he was very familiar with the process indicates that Plaintiff was correct in his assertions that no ICR or NOG forms were available. As State of Ohio argues, Plaintiff was obviously "quite familiar" with the ICR process and, therefore, would have known how to submit an ICR form if any were available. Regardless, taking the facts in the light most favorable to Plaintiff, the Undersigned finds that a genuine issue of material fact exists regarding whether Noble Correctional Institution was out of ICR and NOG forms on June 12, 2015, and June 18, 2015.

As State of Ohio indicates, "ICRs are step one of the grievance process" and the second step is taken by "filing a NOG." (ECF No. 77, at pg. 16, 20.) Accordingly, if no ICR or NOG forms were available, it would have been impossible for Plaintiff to conform to step one and step two at the time he filed his Kites on June 12, 2015 and June 18, 2015. (ECF No. 73-5, at PAGEID # 427–30.) Moreover, Plaintiff indicates in his June 12, 2015 Kite that he was told by a Noble Correctional Institution captain to write his complaint on a Kite because there were no ICR or NOG forms available. (*Id.* at PAGEID # 428.) Again, taking the facts in the light most favorable to the Plaintiff, the Undersigned determines that a material issue of fact remains regarding whether a Noble Correctional Institution captain did instruct Plaintiff to file a Kite because no ICR or NOG forms were available. If a genuine issue of material fact exists regarding whether ICR or NOG forms were available, State of Ohio's argument that it is Plaintiff's fault for not adhering to step one and two must fail at this juncture. *See Risher*, 639 F.3d at 241 ("When pro se inmates are required to follow agency procedures to the letter in order

to preserve their federal claims, we see no reason to exempt the agency from similar compliance with its own rules."). Certainly, State of Ohio neither asserts that the ICR and NOG forms were in fact available at that time, nor puts forth any evidence to support that supposition. (*See* ECF No. 77.)

Although the Undersigned makes no determination on the merits, assuming, *arguendo*, the ICR and NOG forms were unavailable, there is another genuine issue of material fact as to whether the Kites Plaintiff completed will suffice. If they do, Plaintiff would have sufficiently fulfilled steps one and two of the inmate grievance procedure. Step three involves an appeal to the inspector of institutional services. (Stanforth Aff. at ¶¶ 6–10.) Plaintiff asserts that his typed-complaints from July 9, 2015 and March 1, 2016 are sufficient and satisfy step three. (ECF No. 73, at PAGEID # 406; ECF No. 73-7, at PAGEID # 431–38.) State of Ohio asserts that Plaintiff has not fulfilled step three. (*See* ECF No. 77, at pg. 23.) The Undersigned again concludes that a genuine issue of material fact exists as to whether Plaintiff's typed complaints satisfy step three. If a jury concludes that Plaintiff's June 18, 2015 Kite fulfilled step two, he was not required to satisfy step three because he never received a response to the June 18, 2015 Kite. (ECF No. 73, at PAGEID # 406, ECF No. 73-6, at PAGEID # 429–30.) The United States Court of Appeals for the Sixth Circuit has held as follows:

> Under Ohio Administrative Code 5120-9-31(K)(1), an inmate is statutorily authorized to proceed to step two of Ohio's grievance procedure if he does not receive a response to his informal complaint within a "reasonable time." However, such authorization is not granted to inmates who fail to receive a response to a notification of grievance form at step two of the grievance procedure. *See* Ohio Admin. Code 5120-9-31(K)(2). Although step two of the grievance procedure requires the [inspector of institutional services] to "provide a written response to the grievance within fourteen calendar days of receipt," it imparts no authorization to proceed to step three of the grievance procedure to inmates who never receive a response. *Id.* Moreover, the fact that step one instructs inmates to proceed to step two after a "reasonable time," but step two does not, suggests that inmates are foreclosed from proceeding to step three until they receive a response to their step

two grievance.  Lastly, the . . . conclusion that [plaintiff] was obligated to "file an appeal of the disposition of [his] grievance" does not make sense.  [Plaintiff] alleges that he never received a response to his step two grievance, so he had nothing to appeal.  In the absence of any statutory instruction, [plaintiff] proceeded logically . . . . In the end, it cannot be said that an inmate did not exhaust his administrative remedies because he failed to do something not specified, outlined, or required by his prison's grievance procedure.

*Troche*, 814 F.3d at 800–01.

Accordingly, summary judgment would be improper because genuine issues of material fact exist regarding whether Plaintiff properly used the grievance process.  *See Risher*, 639 F.3d at 239–40.  ("Summary judgment is appropriate only if defendants establish the absence of a genuine dispute as to any material fact regarding non-exhaustion.") (internal quotations and citation omitted); *see also Himmelreich*, 766 F.3d at 577–78 (denying summary judgment on a non-exhaustion defense because plaintiff demonstrated a genuine issue of material fact for the jury as to whether defendant prevented plaintiff from exhausting his remedies).

## V.     CONCLUSION

For the reasons stated above, the Undersigned **RECOMMENDS** that the State of Ohio's Motion to Dismiss which has been converted to a Motion for Summary Judgment, be **DENIED**. (ECF No. 48.)

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816*,* 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


**Date: August 7, 2019**                    */s/ Elizabeth A. Preston Deavers*
                                            **ELIZABETH A. PRESTON DEAVERS**
                                            **CHIEF UNITED STATES MAGISTRATE JUDGE**