IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Brandon Ashdown,

    Plaintiff,

v.

Tim Buchanan, *et al.*,

    Defendants.

Case No: 2:17-cv-495

Judge Graham

Magistrate Judge Deavers

## Opinion and Order

Plaintiff Brandon Ashdown brings this action under 42 U.S.C. § 1983. He alleges that defendant Vanessa Sawyer was deliberately indifferent to his serious medical needs while he was incarcerated at Noble Correctional Institution (NCI). He contends that Sawyer, a Health Care Administrator at NCI, refused to provide him with pain medication after he had hernia surgery.

This matter is before the Court on defendant's motion for summary judgment. Upon review of the undisputed evidence, the Court finds that Ashdown's prescription for Tylenol #3 had expired by the time Sawyer became aware of his request for pain medication. Unable to write a new prescription, she directed Ashdown to obtain ibuprofen from the commissary and arranged for a doctor to see him on the next available day. The Court finds as a matter of law that Sawyer was not deliberately indifferent to Ashdown's medical needs and thus GRANTS defendant's motion for summary judgment.

I.    **Background**

    A.    **Facts of the Case**

On June 5, 2015 Ashdown was transported to the Ohio State University Wexner Medical Center for outpatient surgical repair of an inguinal hernia. Following surgery, Ashdown was transported to the Franklin Medical Center (FMC). On the same day, June 5, a doctor at FMC prescribed Tylenol #3 for pain relief, to be taken every 4 hours for 10 days. Doc. 183 at PAGEID 1980, PAGEID 2015; *see also id.* at PAGEID 1991 (OSU medical records showing that Ashdown was prescribed Tylenol #3 as needed for pain).

1

Ashdown remained at FMC until June 9, when he was transported back to NCI. Ashdown Dep. at 107. Discharge papers from FMC reflect that Ashdown had a prescription for Tylenol #3, as needed for pain. Doc. 183 at PAGEID 1970. A nurse examined him upon his arrival at NCI, and he commented that it "was a long ride in cuffs," but there is no record that he complained of being in pain at that point. Doc. 182 at PAGEID 1894.

An Advanced Level Provider (ALP) saw Ashdown on June 10. An ALP has greater authority than a nurse to make medical examination and decisions. Sawyer Dep. at 28, 58–60, 68. Ashdown rated his pain level as being a 3 or 4 out of 10. Doc. 182 at PAGEID 1892; Doc. 178-4 at PAGEID 1580. The ALP gave Ashdown 10 packs of Motrin 400 mg. Doc. 182 at PAGEID 1892.

In the afternoon of June 12, a nurse made a written record of having received a call from a corrections officer, who relayed that Ashdown wanted more ibuprofen. *Id.* The nurse wrote a commissary pass for Ashdown to purchase an over-the-counter "pain reliever of choice." Doc. 184 at PAGEID 2140. The nurse noted shortly thereafter that Ashdown had not arrived to get the commissary pass. Doc. 182 at PAGEID 1892.

On the same day, Ashdown wrote a kite specifically addressed to Sawyer. Doc. 178-4 at PAGEID 1579. He explained that he had been "told to kite you [Sawyer] about this issue." *Id.* at PAGEID 1580; *see also* Ashdown Dep. at 156.

Sawyer, as the Health Care Administrator, managed the health care operations at NCI, in terms of ensuring that there was enough staff, including nurses and ALPs, to provide health care to the inmate population. Sawyer Dep. at 28–29. Under the applicable policy of the Ohio Department of Rehabilitation and Correction (ODRC), a Health Care Administrator is "responsible for the day-to-day operations of medical services at the institution level." Doc. 179-1 at PAGEID 1757. Her responsibilities include: making "[d]ecisions about the deployment of health resources" and defining the "scope of medical services" to be provided; "determining if the number and type of staff is adequate to provide the determined scope of services"; deciding, for procurement purposes, the "equipment, supplies, and materials necessary for health services"; ensuring that medical staff comply with ODRC policy and protocol; establishing "systems for the coordination of care among multidisciplinary medical providers"; and developing an institutional quality control program. Doc. 179-1 at PAGEID 1759.

In his June 12 kite, Ashdown stated that he had undergone hernia surgery on June 5. He reported that since his return to NCI, staff had refused to give him ibuprofen because he "had money on [his] account." Doc. 178-4 at PAGEID 1580. He complained that the commissary sold

only 50 mg tablets when the amount of pain he was feeling in his testicles made him believe that he should be prescribed 1,000 mg of pain reliever. He stated that his situation amounted to "torture" and "cruel [and] unusual punishment." *Id.*

Ashdown wrote a second kite to Sawyer on June 12. Doc. 178-4 at PAGEID 1581. He stated that he was having difficulty urinating. He reported that during the transport from Ohio State to FMC, he was forced to sit on a wooden bench with no back support for several hours. He complained that he had been subjected to "inappropriate medical treatment." *Id.* at PAGEID 1582

Sawyer did not receive the kites until June 16. Sawyer Dep. at 85–86, 94. The kites have time stamps of being received on June 16 at 6:41 a.m. and 6:44 a.m., respectively.[1] Doc. 178-4 at PAGEID 1579, 1581.

When Sawyer received the kites, she reviewed Ashdown's inmate medical charts. Sawyer Dep. at 96, 111–12. She saw that he had been prescribed Tylenol #3 for 10 days starting on June 5 and, thus, the prescription had ended the day before she received the kites. *Id.* at 113–14; *see also* Doc. 183 at PAGEID 2015 (inmate medical record showing that Ashdown's Tylenol #3 prescription expired on June 15).

Sawyer responded to Ashdown by writing on the back of the first kite. Sawyer's written response included a restatement of her review his chart. Specifically she noted that: (1) Ashdown had undergone hernia surgery on June 5 and was prescribed Tylenol #3; (2) he had been evaluated by an ALP on June 10 and had rated his pain as a 3 or 4 out of 10; (3) the ALP had given him 10 packs of ibuprofen and imposed restrictions on lifting; (4) and the ALP had directed on June 10 that he have a follow-up appointment at a surgical clinic in two weeks. Doc. 178-4 at PAGEID 1580; *see also* Doc. 182 at PAGEID 1847, 1892; Sawyer Dep. at 112–14.

Sawyer further wrote – in direct response to Ashdown's complaint about being unable to obtain ibuprofen in a higher dose than 50 mg – that the "commissary has ibuprofen that comes in 200 mg tablets or capsules." Doc. 178-4 at PAGEID 1580. She informed him that there should be 50 tablets or capsules in each ibuprofen bottle. She advised Ashdown to "check" with the commissary to get ibuprofen. *Id.*

---

[1] The record before the Court does not contain a firm indication as to why Sawyer did not receive the kites until June 16. Assuming that Ashdown put the kites in the grievance mail box on June 12, there is no evidence from which a jury could find that Sawyer was responsible for the delay. When asked in her deposition as to how long it normally took for kites to get to her, Sawyer stated that the kites were sent through institutional mail, with the rule being that a kite would receive a response within seven days. Sawyer Dep. at 94–95.

Sawyer then updated Ashdown's chart at 5:00 p.m. on June 16. She recorded that she had received a kite from Ashdown stating that "he is having terrible testical pain." Doc. 182 at PAGEID 1892. She noted that she had responded to the kite by instructing him to purchase ibuprofen in the commissary. She also wrote that she was referring him to be "seen in DSC [doctor sick call] for reevaluation and possible need for pain med." *Id.*

Sawyer placed Ashdown on a doctor sick call for the next available day. Doc. 182 at PAGEID 1847; Sawyer Dep. at 86. She did not have the authority or license to prescribe medication to Ashdown. *Id.* at 87.

Ashdown was seen by a doctor at NCI on June 18. The doctor evaluated his incision and pain and found that his testes were "within normal limits." Doc. 182 at PAGEID 1891; Sawyer Dep. at 88. Ashdown was prescribed Naproxen, an anti-inflammatory pain reliever, for 15 days. Doc. 182 at PAGEID 1891; Doc. 183 at PAGEID 2026.

Ashdown was seen at the FMC surgical clinic on June 22 and at a doctor sick call on June 23. Doc. 182 at PAGEID 1890–91. He was "doing well" with "no swelling" and "[n]o signs of pain." *Id.* at PAGEID 1890.

### B. Procedural History

Ashdown, proceeding *pro se*, filed a Complaint and First Amended Complaint in 2017 alleging that he was subjected to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The three named defendants, including Sawyer, moved to dismiss for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.

Adopting the magistrate judge's Report and Recommendation, the Court granted the motion to dismiss, holding in part:

> The magistrate judge concluded that plaintiff's alleged condition of an inguinal hernia met the objective requirement of a sufficiently serious medical condition. However, the magistrate judge noted that plaintiff's allegations against the named defendants asserted liability based on their supervisory positions at NCI and FMC. . . . With respect to Sawyer, plaintiff alleges no conduct other than the fact that Sawyer ruled on his grievance.
> . . .
> . . . [T]he mere fact that Sawyer allegedly gave a "belligerent response" to plaintiff's grievance is not sufficient to establish liability. *See Grinter* [*v. Knight*, 532 F.3d 567, 576 (6th Cir. 2008)] (the mere fact that a defendant denied an inmate's grievance is not sufficient to establish supervisory liability).

Doc. 32 at PAGEID 153–55.

4

The Court granted plaintiff leave to amend the First Amended Complaint to identify the John Doe defendants. He was provided with court-appointed counsel and amended his complaint twice more.

In his Third Amended Complaint filed in 2020, plaintiff asserted § 1983 claims against Sawyer and eleven other defendants. He alleged that Sawyer had promulgated rules and policies at NCI which caused the Eighth Amendment violations to occur. In particular, plaintiff alleged that he had been prescribed Percocet as a pain reliever following his hernia surgery and that Sawyer had refused to fill his prescription in response to his June 12 kites. Plaintiff alleged that Sawyer had a policy to "deny prisoners the benefit of their prescribed medications and medical treatment." Doc. 117 at ¶ 50.

Plaintiff further alleged that the manner in which he was transported from Ohio State to FMC and from FMC to NCI violated the Eighth Amendment. He alleged that he was belly-chained, shackled, and forced to sit long periods on benches. Plaintiff asserted that Sawyer was responsible for "maintaining policies" which caused inmates to be subjected to deliberate indifference of their serious medical needs during "the transport and arrival of prisoners under medical treatment." *Id.* at ¶ 67.

In June 2021, the Court granted a motion to dismiss filed by the eleven defendants other than Sawyer. The Court found that plaintiff's claims were time-barred. Doc. 166.

The Court then conducted status conferences with the parties on August 13 and 19, 2021 regarding the remaining defendant, Sawyer. Plaintiff's counsel stated that his claims had two facets: (1) that Sawyer was responsible for a policy whereby inmates were given a less potent "therapeutic substitute" whenever they were prescribed a powerful painkiller; and (2) that Sawyer was responsible for a policy whereby inmates were transported in a certain fashion (belly-chained, shackled, and sitting upright) regardless of medical condition or medical need. Plaintiff's counsel asserted that the use of belly-chains and shackles on Ashdown aggravated his open wound or incision area.

The Court granted defendant Sawyer's request for leave to file a motion for summary judgment. Doc. 175. The Court also scheduled this matter for a jury trial in December 2021.

This matter is now before the Court on defendant's motion for summary judgment.

## II. Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if the evidentiary materials in the record show that there is "no genuine dispute as to any material fact and the movant

5

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Longaberger Co. v. Kolt*, 586 F.3d 459, 465 (6th Cir. 2009). The moving party bears the burden of proving the absence of genuine issues of material fact and its entitlement to judgment as a matter of law, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case on which it would bear the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005).

The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphasis in original); *see also Longaberger*, 586 F.3d at 465. "Only disputed material facts, those 'that might affect the outcome of the suit under the governing law,' will preclude summary judgment." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 702 (6th Cir. 2008) (quoting *Anderson*, 477 U.S. at 248). Accordingly, the nonmoving party must present "significant probative evidence" to demonstrate that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).

A district court considering a motion for summary judgment may not weigh evidence or make credibility determinations. *Daugherty*, 544 F.3d at 702; *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994). Rather, in reviewing a motion for summary judgment, a court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. The evidence, all facts, and any inferences that may permissibly be drawn from the facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Eastman Kodak Co. v. Image Technical Servs., Inc.*, 504 U.S. 451, 456 (1992). However, "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252; *see Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009).

### III. Discussion

To establish an Eighth Amendment violation based on the failure to provide medical care, a prisoner must show that he has a serious medical condition and that the defendant displayed a deliberate indifference to his serious medical needs. *Farmer v. Brennan*, 511 U.S. 825, 839 (1994); *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). A claim for deliberate indifference has both an objective

6

and a subjective component. *Alspaugh v. McConnell*, 643 F.3d 162, 169 (6th Cir. 2011). The objective component requires a sufficiently serious medical need, and the subjective component focuses on the prison official's state of mind, requiring something more than mere negligence, but something less than acts or omissions for the very purpose of causing harm. *Barnett v. Luttrell*, 414 Fed. App'x 784, 787–788 (6th Cir. 2011). The prison official must be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and she must also draw the inference. *Blackmore v. Kalamazoo County*, 390 F.3d 890, 896 (6th Cir. 2004).

Moreover, to establish liability under §1983, a plaintiff must demonstrate that a defendant is personally responsible for the unconstitutional actions which injured him. *Monell v. New York City Dept. of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008). To assert a constitutional claim against individual government officials, "a plaintiff must plead that each Government-Official defendant, through the official's own individual actions, has violated the Constitution," and cannot rely on a theory of *respondeat superior* or vicarious liability. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). Section 1983 liability cannot be based on mere knowledge or failure to act. *Id.* To hold a supervisor liable under § 1983, plaintiff "must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct[.]" *Everson v. Leis*, 556 F.3d 484, 495 (6th Cir. 2009).

At the summary judgment stage, defendant acknowledges that plaintiff is able to put forth evidence from which a reasonable juror could find that he had an objectively serious medical condition. Namely, Ashdown had an inguinal hernia which required surgery at Ohio State's Medical Center and required post-operative medical care.

Moving to the subjective component, the Court finds that plaintiff has failed to put forth any evidence demonstrating that Sawyer was responsible for a policy concerning the transport of inmates generally or of Ashdown in particular. Sawyer testified that, with one exception not relevant here, she did not participate in formulating policy or in issuing "post orders" regarding the transport of inmates. Sawyer Dep. at 59–66, 74–79; *see also id.* at 26–27 (Sawyer may have helped with NCI's policy concerning which hospitals are contacted when an ambulance is needed for a medical emergency). Further, Sawyer was not involved in scheduling or arranging for Ashdown's surgery or related transport. *Id.* at 74–79, 81–82.

In response to defendant's motion for summary judgment, plaintiff has abandoned his claim that Sawyer was responsible for the allegedly improper way in which Ashdown was transported from Ohio State to FMC and from FMC to NCI.

7

Plaintiff has also abandoned the claim that Sawyer implemented a policy whereby inmates were denied prescription pain relief in favor of less powerful substitutes.

Plaintiff's opposition brief to the motion for summary judgment focuses solely on Sawyer's response to the June 12 kites. Plaintiff asserts that the kites put Sawyer on notice of his serious medical needs and that she was deliberately indifferent by failing to ensure that he received prescription pain relief.

In evaluating this claim, the Court must emphasize the importance of defining the exact nature of the medication Ashdown was prescribed. The Third Amended Complaint alleged that Ashdown was prescribed Percocet upon his discharge from Ohio State's Medical Center. Defendant has proved beyond dispute that Ashdown was not prescribed Percocet upon discharge. He instead was prescribed Tylenol #3. Doc. 183 at PAGEID 1970, 1980, 1991, 2015. Plaintiff's response brief does not make any assertion that he was prescribed Percocet.

The duration of the prescription also is critical. The prescription for Tylenol #3 lasted ten days, from June 5 to 15. Doc. 183 at PAGEID 1980, 2015. By the time Sawyer received Ashdown's kites on June 16, the prescription had already expired. Sawyer appreciated that fact from her review of Ashdown's chart. Sawyer Dep. at 114. Sawyer could neither prescribe medication nor change an existing prescription – a point that plaintiff does not dispute. *Id.* at 87. With the prescription having expired, Sawyer instructed Ashdown to get ibuprofen from the commissary and ordered that he be seen at the next available doctor sick call, specifically noting the possible need for pain medication. *Id.* at 86; Doc. 182 at PAGEID 1847, 1892.

Plaintiff argues that amount of time which lapsed from the writing of his June 12 kites until Sawyer responded on June 16 demonstrates deliberate indifference. The Court recognizes that it was unfortunate that Ashdown had to wait four days. However, plaintiff has not put forth evidence from which a jury could find that the delay can be attributed to Sawyer. She reviewed the kites and responded to Ashdown on the day she received them and then arranged for him to be seen by a doctor on the next available day. Moreover, she specifically advised Ashdown to purchase ibuprofen in 200 mg tablets from the commissary in the meantime.

Plaintiff additionally faults Sawyer for failing to act in light of the allegations that Ashdown was twice transported with belly-chains and shackles aggravating his incision area and that he had to sit upright on a hard bench. Plaintiff has submitted a purported expert opinion stating that it would have been obvious to a reasonable medical professional, including a registered nurse like Sawyer,

8

that the conditions of Ashdown's transport would have greatly increased his post-operative pain and that ibuprofen would have been inadequate for his pain level. Doc. 189-1 at PAGEID 2368.

But plaintiff has not pointed to any evidence that Sawyer knew about the alleged conditions of Ashdown's transport. The chart which Sawyer reviewed showed only that Ashdown had complained of the transport from FMC to NCI being a "long ride in cuffs" and that he had rated his pain level as being a 3 or 4 out of 10 the day after he arrived back at NCI. Doc. 182 at PAGEID 1892, 1894. Moreover, the first kite did not say anything about the conditions of transport. In the second kite, Ashdown complained that during the transport from Ohio State to FMC on June 5, he sat on a wooden bench with no back support for several hours. He said nothing of belly-chains or shackles aggravating his incision area, nor did he make any mention of the conditions of transport from FMC to NCI.

To be sure, Sawyer appreciated that Ashdown was in pain. She wrote in her progress notes that he had reported "having terrible testical pain." Doc. 182 at PAGEID 1892. But what Ashdown asked for in his first kite was ibuprofen in a dosage above 50 mg, and Sawyer informed him that he had access to 200 mg tablets at the commissary. Doc. 178-4 at PAGEID 1580; *see also* Doc. 182 at 1892 (reflecting Ashdown's request on June 12 for more ibuprofen). Again, knowing that his prescription for Tylenol #3 had expired and that she could not write a new one, she ordered a doctor sick call for Ashdown. And she knew too that he was due to been seen in about a week at the FMC surgical clinic for a follow-up evaluation. Doc. 178-4 at PAGEID 1580; Doc. 182 at PAGEID 1891 (showing that Ashdown was seen at FMC on June 22).

Finally, plaintiff takes issue with Sawyer's direction to Ashdown that he go to the commissary, which meant that he would have to pay for the ibuprofen himself. The Court finds as a matter of law that this does not demonstrate deliberate indifference by Sawyer. She testified that she was following the institution's policy. Sawyer Dep. at 107. Inmates would often be given a modest supply of non-prescription medication to start. *Id.* at 105–107. Ashdown received ten packs of Motrin on June 10 from an ALP. Doc. 182 at PAGEID 1892. By June 12 he asked for more ibuprofen and a nurse gave him a commissary pass. *Id.* Directing Ashdown to the commissary aligned with NCI's policy that inmates, once having consumed the free supply given to them, had to purchase over-the-counter medication from the commissary.[2] Sawyer Dep. at 105–107.

---

[2] Ashdown does not allege that he lacked sufficient funds in his inmate account to pay for ibuprofen. Records show that on June 18, 2015, Ashdown spent $85 from his inmate account on

9

In sum, the Court finds defendant is entitled to summary judgment. In order to satisfy the subjective component of his claim, plaintiff must show that Sawyer subjectively perceived a substantial risk of serious harm to Ashdown and disregarded that known risk in her treatment. *See Blackmore*, 390 F.3d at 896. Sawyer perceived that Ashdown needed pain relief medication and that he was asking for ibuprofen in a dose higher than 50 mg. She directed him on how to obtain ibuprofen in 200 mg tablets. Without authority to prescribe him a more powerful form of pain relief, she ordered a doctor sick call for the next available day. The Court finds as a matter of law that Sawyer's response to Ashdown's kites was not deliberately indifferent to serious medical needs.

## IV. Conclusion

Accordingly, defendant's motion for summary judgment (doc. 180) is GRANTED. The Clerk of Court is instructed to enter judgment in favor of the defendants.

DATE: November 9, 2021

s/ James L. Graham
JAMES L. GRAHAM
United States District Judge

---

personal care and food items, leaving him with a positive balance of at least $13 in his account. Doc. 178-2 at PAGEID 1279–1281.